## JOHN G. BALLANCE

### v.

## THE CITY OF PEORIA.

*Opinion filed June 17, 1899.*

1. RIPARIAN RIGHTS—*title of riparian owner extends to thread of the stream.* The title of an owner of land bounded by a navigable river extends to the middle thread of the stream, subject to the right of navigation resting in the public.

2. SAME—*riparian owner entitled to compensation for taking submerged portion of land.* A bridge company authorized by the State to build a bridge across a navigable stream has no power to erect and maintain piers or other structures upon submerged land of a riparian owner lying between low-water mark and the middle thread of the stream without making compensation.

3. SAME—*lessee of riparian owner takes to thread of stream unless there is provision to the contrary.* The lessee of lots fronting on a navigable stream takes to the middle thread of the stream, unless there is something in the instrument showing a different intention.

4. CONSTRUCTION—*court cannot indulge in conjecture where instrument is unambiguous.* Where a lease of lots fronting on a navigable stream is unambiguous in its description of the premises, and contains nothing from which an intention to exclude a portion of the premises may be inferred, the court cannot indulge in conjecture or resort to parol evidence, but the language of the instrument itself must control its construction.

5. LEASES—*assignee of lease cannot question lessor's title before surrender of possession.* A city having purchased the property of a bridge company, including its rights under a lease of certain lots of a riparian owner, and entered into possession, is estopped to question the title of such owner or set up a prior right in itself before the execution of the lease, without having first surrendered possession.

6. SAME—*an offer to surrender part of leased premises is not sufficient.* An offer by the assignee of leased property to surrender a portion of the premises at the expiration of the lease is not sufficient, and the lessor may treat such assignee as a tenant holding over and bring an action for rent.

*Ballance* v. *City of Peoria,* 70 Ill. App. 546, reversed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Peoria county; the Hon. T. M. SHAW, Judge, presiding.

McCULLOCH & McCULLOCH, and JAMES M. RICE, for appellant.

W. V. TEFFT, City Attorney, and HENRY MANSFIELD, for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This was an action of debt brought by John G. Ballance against the city of Peoria, on a lease. The lease was executed on the 20th of July, 1866, between Charles Ballance of the first part and the Peoria Bridge Association of the second part. By the lease the party of the first part leased and delivered to the party of the second part certain premises "situate and being in the city and county of Peoria and State of Illinois, known and described as follows, to-wit: The south-westerly half of lot No. 4, and so much of lot No. 5 as lies between what is known as the French line and the Illinois river, all in block No. 50, Bigelow & Underhill's addition to Peoria. To have and to hold the said above described premises, with all the appurtenances, unto the said party of the second part, its successors and assigns, from the 20th day of July, 1866, for and during and until the 20th day of July, 1891,—a period of twenty-five years."

In consideration of the leasing the party of the second part agreed and covenanted as follows:

"*First*—It will pay to said party of the first part the sum of $200 per annum for the first five years, and the second, third, fourth and fifth periods, of five years each, it will pay six per cent on the value of the ground, which value is to be fixed on or about the 20th day of July, 1871, 1876, 1881 and 1886, by mutual agreement of the parties hereto, if they can agree on said valuation, but if they cannot agree, each party at each of said periods of time shall choose a competent, disinterested person, and these two so chosen shall choose a like third person, and these

three persons, or a majority of them, shall fix said value. The rent to be paid on the 20th day of January each year.

"*Second*—It will pay the proper officer all taxes and assessments, ordinary and extraordinary, that may be levied upon said premises that shall be required of said party of the first part as owner thereof, commencing with the taxes and assessments of 1866, and so for every year as long as it shall occupy said premises, but for the taxes of 1891 the party of the first part shall pay the taxes on the ground and the party of the second part shall pay the taxes on all improvements thereon.

"*Third*—It further agrees to hold said premises for said term as the tenants of said party of the first part and acknowledge no other landlord, and at the expiration of said period re-deliver the peaceable possession thereof to said party of the first part, his heirs or assigns, in as good order as the same now are, necessary wear and dilapidation only excepted.

"*Fourth*—At the expiration of this lease all the improvements, buildings, etc., that may then be upon these premises shall be valued by three persons to be chosen in same way and manner as above described in valuation of the ground, and the said party of the first part shall have privilege of taking such improvements at the valuation of a majority of such persons, if he shall elect to do so. If the party of the first part declined to take such improvements and buildings, the Peoria Bridge Association, its successors and assigns, to have the privilege and authority to remove same, and shall be allowed thirty days from the expiration of this lease in which they may remove the same."

The lease also provided that if the lessor took the same he was to pay the appraised value on or before the day the lease expired. The lease also contained the usual provisions of forfeiture and re-entry for non-payment of rent, etc., which it will not be necessary to set out here.

The lots described in the lease extend from Water street to the Illinois river, which forms their south-eastern boundary, and they have a frontage of ninety feet on the river. Lot 6, with a frontage of sixty feet, lies between lot 5 and Hudson (now Bridge) street. This street was laid out eighty feet wide and extends to the river.

It appears from an examination of the record that on the first day of February, 1840, the legislature granted to William L. May, his heirs and assigns, authority to establish a ferry at the outlet of Lake Peoria, and to operate the same from both sides of the outlet on the Illinois river, either from any public highway or from any lands and lots which then were or might be owned by them. On the 23d of February, 1841, the same grant was renewed. On the third day of March, 1845, the legislature passed an act providing as follows: "That William L. May and his associates, and his and their heirs and assigns, be and they are hereby authorized to build a toll bridge across the Illinois river at the outlet of Lake Peoria, at the place where the said May now keeps his ferry, and to have, keep, maintain and enjoy the same. Said bridge shall be built of such height and constructed in such manner as in nowise to injure or impede the navigation of said river." On the 26th day of January, 1847, the bridge not having been built, the legislature renewed the grant, with this further provision: "Said May and his associates, and his and their heirs and assigns, are hereby authorized to erect as many piers of stone or other material in the bed of said river as may be necessary for the support and construction of said bridge: *Provided,* a space of at least seventy-five feet from pier to pier, and embracing the principal channel of the river, be left and always kept open for the passage of all craft navigating said river." On June 19, 1852, the legislature passed an act providing "that said corporation shall be known by the name and style of 'The Peoria Bridge Association,' and by that name and

style shall be capable of suing and being sued, pleading and being impleaded, answering and being answered unto, in all courts and places whatsoever."

Prior to and at the time of the execution of the lease the bridge association had a bridge over the river, commencing at the foot of Hudson street and connecting on the other side with a public road running from Peoria to Springfield. After the execution of the lease Charles Ballance died and appellant became the owner of the demised premises. The bridge association attorned to him, and paid him rent, as provided in the lease, until the third day of November, 1886, when the association sold the bridge to the city of Peoria. The property sold, as described in the deed, is as follows: "The wagon road bridge across the Illinois river, commencing at the foot of Hudson (now Bridge) street, in the city of Peoria, and extending thence across the said river to its connection with the Springfield and Peoria wagon road, together with its approaches in and upon said Hudson or Bridge street and in and upon the said Springfield and Peoria road, its office or toll-collecting house and tool house, situate at the entrance to said Bridge street from said Hudson or Bridge street, its trestle-work, piers, abutments, bents, ice-breakers, and all other appurtenances in or upon the banks of said river or thereunto belonging or in anywise appertaining, and the right to keep and maintain the same as now constructed or in such manner as may be necessary for the safety of said bridge; also all the right, title and interest of the said party of the first part in and to the privileges and franchises granted by the legislature of the State of Illinois to William L. May, his associates, heirs and assigns,   *   *   * to have and to hold the afore granted premises, and each and every part thereof, to the said party of the second part for public use as a free bridge and highway, to be maintained and kept in repair by said party of the second part forever. And the party of the first part, for

180—3

the considerations aforesaid, doth further grant, bargain and sell unto the said party of the second part all the right, title and interest it has in and to lot No. 4, and to so much of lot No. 5 as lies between what is known as the French line and the Illinois river, all in block No. 50, in Bigelow & Underhill's addition to the city of Peoria, by virtue of a lease of the same executed by Charles Ballance, dated the 20th day of July, A. D. 1866, and recorded in the recorder's office of Peoria county, in book W. B., pages 508-510; also its pile-driver, boat, and all its tools in its said tool-house or used by it, in the operation of said bridge. It being a part of the consideration of this conveyance, and the same is made upon the condition and agreement, that the said party of the second part shall pay all rent hereafter to become due from the party of the first part upon the said lease so executed to it by the said Charles Ballance as aforesaid, and shall in all respects perform the covenants contained in the said lease to be performed by said party of the first part; and that the party of the second part shall save and keep harmless the said party of the first part from all taxes now or hereafter to be assessed upon said bridge and its appurtenances, and the franchise of said party of the first part for the year A. D. 1885, wheresoever assessed."

After the sale of the property there was a delay, for a time, in the payment of rent, but finally the rent for the last period of five years was fixed by agreement between appellant and appellee at $250 per annum, which appellee paid until the expiration of the term provided in the lease. Since the lease expired appellee has refused to pay any rent, and this action was brought to recover rent accruing after the lease expired. The action is predicated on the theory that after the lease expired appellee failed to surrender the possession of the leased premises, but held over, and hence it is liable for the payment of rent as a tenant holding over. The circuit court, however, on

a trial without a jury, held that the city was not liable, and that judgment was affirmed in the Appellate Court.

The bridge, as constructed, does not cross any portion of the demised premises, but, as will be seen from the following diagram put in evidence on the trial, there is an ice-break and a bridge-rest to support a draw-span of the bridge when turned for the purpose of permitting boats to pass up and down the river, erected in the river from thirty to forty feet below low-water mark, on part of leased lots 4 and 5:

After the expiration of the lease the city of' Peoria did not surrender to appellant the possession of that por-

tion of lots 4 and 5 which it occupied as an ice-break and bridge-rest, nor that part of lot 5 occupied by the draw-span when the bridge is thrown open for the passage of boats, but it remained in the possession of the premises so used, after the expiration of the lease, in the same manner that it had before. The city, however, claimed that the lease did not embrace any part of lots 4 and 5 below low-water mark, nor did it apply to the draw-span. The city also contended that the rights of appellant as a riparian owner are subordinate to the rights of appellee, as successor to the bridge association, to maintain the structures in the river fronting appellant's lots. The city therefore contended it was under no obligation to surrender that part of the premises so occupied, to appellant.

Lots 4 and 5 are a part of Bigelow & Underhill's addition to Peoria, which was platted and laid off in 1836. The plat was acknowledged and recorded as required by law. The lots extended from Water street to the Illinois river, as shown by the plat. When Charles Ballance became the owner of lots 4 and 5 bordering on the Illinois river, he occupied the position of a riparian owner and was entitled to all the rights and privileges of such an owner. This court has held in numerous cases, beginning with *Middleton* v. *Pritchard,* 3 Scam. 510, that the title of a riparian owner where land is bounded by a navigable stream like the Illinois river, extends to the middle thread of the stream, subject to the right of navigation resting in the public. (*Board of Trustees* v. *Haven,* 5 Gilm. 548; *City of Chicago* v. *Laflin,* 49 Ill. 172; *Braxon* v. *Bressler,* 64 id. 488.) In the last case cited the court was asked to reconsider its previous decisions on the question and establish a different rule, but after referring to a number of cases in support of the rule which had been adopted by the court, it was expressly held that grants of land bounded on rivers, or upon their margins above tide water, carry the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant

clearly denote the intention to stop at the edge of the water. Under the law, therefore, as settled by this court, there can be no doubt that the title of Ballance to lots 4 and 5 did not terminate at the water's edge but extended to the center thread of the river, subject only to the rights of navigation resting in the public. .

By recurring to the lease it will be seen that the property leased was described as "the south-westerly half of lot 4, and so much of lot 5 as lies between what is known as the French line and the Illinois river." By this description all of the two lots fronting on the river was embraced in the lease, and as the title of Ballance to the lots extended to the center thread of the river, all that part of the lots lying between the water's edge and the center thread of the river was embraced in the lease, unless the lease contains language excluding that portion of the lots from its provisions. In other words, where an owner of premises fronting on a river like the river in question leases or sells the property, the lessee or grantee will take to the center thread of the stream, unless there is something in the instrument showing a different intention of the parties.

It is, however, contended that such a construction may be put upon the lease as will limit its operation to so much of lot 5 as lies between the French line and low-water line and the south-westerly half of lot 4 to the low-water line, and thus exclude from the lease the submerged ground occupied by the bridge-rest and ice-break. No exception or reservation of any portion of the premises appears on the face of the lease. It conveys in plain terms the whole of the south-westerly half of lot 4 and all of lot 5 lying between the French line and the Illinois river, "to have and to hold the above described premises, with all the appurtenances, unto the party of the second part, its successors and assigns, from the 20th of July, 1866, until the 20th of July, 1891." By the third clause of the lease the party of the second part agreed to hold

the whole of said premises as the tenant of the party of the first part, and at the expiration of the lease re-deliver possession of the whole of the premises to the party of the first part. No ambiguity is found in the lease, and it contains nothing from which an intention may be inferred that any portion of the premises should be excluded from its operation. Under such circumstances, the court, in its construction, cannot indulge in conjecture or resort to parol evidence, but the language of the instrument itself must control its construction. *Fowler* v. *Black*, 136 Ill. 363.

In *Fletcher* v. *Phelps*, 28 Vt. (11 Williams,) 257, in discussing a similar question, the court said: "As a general rule, if the description of the land in a deed is ambiguous or doubtful, or if the lines and monuments referred to are lost or destroyed, parol evidence of the practical construction given by the parties, by acts of occupancy, recognition of monuments or boundaries, is admissible for the purpose of identifying the land and in aid of the interpretation of the deed. (*Stone* v. *Clark*, 1 Metc. 378; *Waterman* v. *Johnson*, 13 Pick. 261; 1 Greenleaf, 301, note.) But when no ambiguity exists, and the parties, in describing the land, have used terms and language in the deed referring to known, existing and permanent monuments, it is the duty of the court to give the description and the language of the parties a legal construction, and parol evidence is no more admissible to control its legal effect than it is of any other stipulation of the parties contained in the deed. It is for the court to decide what is embraced in the deed and to definitely determine its lines and boundaries. Where land is sold and bounded on a river or stream of water above tide water, the grant extends to the middle of the channel or thread of the stream. That is the legal effect of the conveyance, and it cannot be varied or controlled by parol testimony,"— citing *Taylor* v. *Williamson*, 4 Mason, 397; *Hooper* v. *Cummings*, 20 Johns. 91; *Claremont* v. *Carleston*, 2 N. H. 369; Angell on Water-courses, secs. 11, 12, and notes.

What is said in the case cited applies here. Under the lease that portion of the premises occupied as a bridge-rest and ice-break cannot be excluded from the operation of the lease without violating a well known rule of construction of written instruments.

It is, however, said in the argument, that before and at the time the lease was executed the bridge-rest and ice-break occupied substantially the same space they do now. Upon looking into the record it will be found that the bridge association had constructed a bridge-rest and ice-break before the lease was executed; but they were of a temporary character, and after the lease was executed, in the fall of 1866, the bridge association commenced the construction of a new ice-break and bridge-rest, which were completed in the early part of 1867, and as thus constructed they have been used ever since. Doubtless one object of the lease was to acquire rights in the property in controversy in order to enable the bridge association to make such repairs on the works in the river as would better enable it to subserve the purpose for which it had been organized. This seems apparent from the fact that the leased premises have only been used by the lessee for a bridge-rest, ice-break and swing bridge, except on a few occasions old lumber may have been piled on the bank of the river; but no buildings have been erected on any part of the leased premises nor have any other improvements been made thereon, except only the bridge-rest, ice-break and swing bridge.

But it is claimed in the argument that when the State granted the bridge association the right to construct and maintain the bridge it conferred the power to so construct it as not to interfere with navigation, and as the draw-span, bridge-rest and ice-break were necessary to such construction, the rights of appellant as a riparian owner are subordinate to the right to maintain those structures on the submerged lands fronting appellant's lots,—in other words, the grant of the legislature to

construct the bridge across the Illinois river impliedly empowered the bridge association to take and use private property in the construction and operation of the bridge without making compensation therefor. It will be observed that the ferry that William L. May was authorized to establish was located from the foot of Hudson (now Bridge) street across the river to the Springfield wagon road, on the other side of the river, and the act of the legislature authorizing the construction of the bridge located it at the same place where May kept his ferry,—that is, from the foot of Hudson street across the river to the Springfield wagon road. At the time of these grants to operate a ferry and to construct the bridge, Bigelow & Underhill's addition to Peoria, located on the river, was platted into lots, blocks and streets, of which Hudson street was one. Thus the fee of Hudson street, extending from the shore to the middle thread of the river, was in the city of Peoria, as held in *Village of Brooklyn* v. *Smith*, 104 Ill. 429. It is therefore apparent that the legislature, in authorizing the construction of the bridge, did not attempt to confer, either directly or indirectly, the power to take private property, but merely authorized the bridge to be constructed on a part of a public street, where private property rights were not involved.

But conceding that there was an implied power vested in the bridge association to take such property as might be necessary to be used in the construction of the bridge across the river, that power could not be exercised unless the bridge association first made compensation to the owner of the property sought to be taken, because the private property of an owner cannot be taken for a public use unless just compensation is made. This is manifest from a provision of the constitution of 1848, which was in force at the time the act to construct the bridge was passed and at the time the bridge was built, as follows: "Nor shall any man's property be taken or applied to

public use without the consent of his representatives in the General Assembly nor without just compensation being made to him." The language of the constitution is plain and free from ambiguity, and clearly prohibits the taking of property of any person, regardless of the situation of that property. It is immaterial whether the property be on the bank of a river or forty feet below the water's edge, as was the case here.

In *City of Chicago* v. *McGinn*, 51 Ill. 266, where the power of the city of Chicago to determine where and under what circumstances bridges crossing the Chicago river should be open was involved, it was held that the fee of such portion of the river as is measured by the width of the street of which the bridge forms a part is in the corporation, and that it was competent for the corporation to devote such portion of the river to any use which, in the judgment of its authorities, should be deemed most promotive of the public interest, subject only to the easement of navigation. It is there said (p. 272): "The water and the bed of the Chicago river are the property of the riparian owners, subject only to an easement in the public for the purposes of navigation. The fee in the streets of the city have been held by this court to be vested in the corporation. (*Board of Trustees* v. *Haven*, 11 Ill. 554.) Bridges are but streets or highways over water. The fee, therefore, of all such portions of the river as are crossed by bridges is likewise in the corporation, subject to the same public easement,—not only such portion of the river as the bridge actually covers, but so much of it as is measured by the width of the street of which the bridge forms a part."

What is said in regard to the Chicago river applies to the Illinois river, as both lie wholly within the State. If the city has the right to control and use the river and the soil covered by it for the width of the street, as a riparian owner, subject to the easement in the public for the purposes of navigation, a lot owner bordering on the river

has the same right, and if clothed with that property right, his property, although it may be submerged lands, cannot be taken without just compensation. In *Chicago and Pacific Railroad Co.* v. *Stein*, 75 Ill. 41, where the property of a riparian owner on the north branch of the Chicago river was damaged by the erection of a pier in the river in the construction of a railroad bridge over the river, under a charter granted by the State, we held that an action for damages would lie. After citing authorities it is there said (p. 45): "From these authorities it is clear that appellees were the owners of the lots fronting upon the river to the center of the current, subject only to the right of the public to the free and undisturbed navigation of the river. The State could not take or damage appellees' property fronting upon or in the bed of the river without first making compensation therefor, nor could it by granting a charter to appellant authorize appellant to do what it could not, in its sovereign capacity, do itself." When Ballance acquired his two lots fronting on the river he took and held the property subject to all the rights of navigation held by the public in the Illinois river, but no new burden could be imposed upon his lands without making just compensation. The State was clothed with power to authorize a bridge association or a railroad company to construct a bridge over the river, but neither one nor the other had the right to take any portion of Ballance's property without making compensation in the mode provided by law.

One other question remains to be considered. As has been seen, the lease provides that the lessee shall hold the premises as tenant of the lessor and acknowledge no other landlord, and at the expiration of the term provided in the lease re-deliver the peaceable possession of the premises leased, to the lessor. The bridge association entered into the possession of the premises, extending to the center thread of the river, under this lease, and, having so entered and occupied the premises, it and

its grantee, the city of Peoria, are bound and concluded by the terms of the lease. They cannot controvert the title under which they entered, or set up any title or right existing in themselves prior to the execution of the lease. Where a tenant enters into possession under a lease he is estopped from denying the title of his landlord. The tenant must surrender the possession to the landlord before he can assail or question the title under which he entered. (*Tilghman* v. *Little*, 13 Ill. 240; *Sharp* v. *Kelley*, 5 Denio, 431; 1 Washburn on Real Prop. book 1, sec. 4, p. 159; *McConnell* v. *Boudry*, 4 Mon. 329; *Jackson* v. *Harper*, 5 Wend. 246.) In the latter case it is said: "The defendant is estopped from contesting the title under which he entered, *in any manner*, as against his original landlord or any other person who has acquired or succeeded to his title. He can no more show that the premises belong to the State than he can that they belong to himself. He must first restore the possession which he obtained from his landlord, and then, as plaintiff, he may avail himself of any title which he has been able to acquire." Upon the expiration of the lease the city was bound to surrender the possession of all the property embraced in the lease to appellant. An offer to surrender a part was not sufficient, as appellant was under no obligation to accept a part. The city, therefore, having failed to surrender the leased premises to appellant upon the expiration of the lease, appellant had the right to treat the city as a tenant holding over, and bring his action to recover rent.

The judgments of the Appellate and circuit courts will be reversed, and the cause will be remanded to the circuit court for another trial consistent with this opinion.                 *Reversed and remanded.*

Mr. CHIEF JUSTICE CARTWRIGHT took no part in the decision of this case.