**FRUIN–COLNON CORPORATION and Granite Construction Company, d/b/a A Joint Venture, Plaintiffs,**

v.

**Bernard J. VOGT, James H. Vogt, Norbert Vogt, and Sharon K. Vogt, Defendants.**

Civ. No. 78–4191.

United States District Court, S. D. Illinois.

Oct. 22, 1980.

Michael E. Wilson and James L. Hawkins, Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., Allan Goodloe, Jr., Pope & Driemeyer, Belleville, Ill., for plaintiffs.

Michael V. Frierdich, Zimmer & Frierdich, Columbia, Ill., David B. Stutsman, Walker & Williams, Belleville, Ill., for defendants.

## ORDER

FOREMAN, Chief Judge:

This case presents before the Court a narrow issue of law: whether activity on a navigable waterway by construction barges building a bridge paid for almost entirely by federal money yet contracted by the State, can constitute a trespass on an adjacent owner's riparian rights in the riverbed and shore.

Plaintiffs' complaint sought declaratory, injunctive and damage relief in the following requests: (1) a declaration that plaintiffs' past and intended uses of the Mississippi and connecting navigable waters are authorized by law; (2) an injunction forbidding defendants from unlawfully interfering with plaintiffs' efforts; and (3) an order that defendants pay for damages caused by their wrongful interference with bridge construction. Defendants denied that the uses were lawful or that they had unlawfully interfered with bridge building activities. Defendants also counterclaimed in the amount of $200,000 for damage caused by the trespasses, and sought an injunction preventing further trespass.

Jurisdiction, alleged by plaintiffs to lie under 28 U.S.C. § 1333, was contested. The Court, by order of May 21, 1979, found admiralty jurisdiction proper, and plaintiffs' election to identify their claims in admiralty invalid under Rule 9(h) of the Federal Rules of Civil Procedure.

Bench trial was held on September 18, 1980, at which time testimony was heard and exhibits were admitted. The parties also submitted lengthy trial briefs. Plaintiffs' essential contention in their brief and at trial is that the title of defendant riparian owners to the riverbed is subject to the federal "navigational servitude," and that their activities on the water are within the ambit of the navigational servitude. Defendants argue in reply that the project is a state project, federal funding notwithstanding, and that since it is not a federal project, the federal navigational servitude does not apply. Defendant further argues that federal law governing federally funded highway construction requires that state law be applied in this instance, and that Illinois law is dispositive in defendants' favor.

A review of the arguments, pleadings and testimony indicates that the Court must decide in favor of defendants and the Court thereby refuses to grant the relief requested by plaintiffs.

## FACTS

The facts were largely undisputed and were stipulated to at the pretrial conference of September 4, 1980. The Court hereby ADOPTS the following findings of fact.

1. Plaintiff, Fruin–Colnon Corporation, is a Missouri corporation with its principal place of business in the City of St. Louis, State of Missouri.

2. Plaintiff, Granite Construction Company, is a California corporation with its principal place of business in the County of Santa Cruz, State of California.

3. Defendants are each Illinois residents residing at R.R. # 2, Columbia, Illinois.

4. Defendant, Norbert Vogt, is the father of defendants, Bernard J. Vogt and James H. Vogt.

5. Defendant, Sharon K. Vogt, is the wife of defendant, Bernard J. Vogt.

6. On March 30, 1977, defendants, Bernard and Sharon Vogt, executed a written instrument entitled "Dedication of Right-of-Way for a Freeway."

7. On July 15, 1977, the State of Illinois Department of Transportation awarded a contract to plaintiffs authorizing plaintiffs to furnish materials for and construct the substructure for the three lane bridge carrying the westbound traffic of Federal-aid Interstate Route 270 over the Mississippi River at Jefferson Barracks, and to construct certain piers for the three lane bridge carrying the eastbound traffic. Said bridge construction work shall be sometimes referred to as the "Jefferson Barracks Bridge Project."

8. The plans designate boundaries for a right-of-way within which the two three lane bridges are to be located (hereafter said right-of-way shall be referred to as "the right-of-way area"). The right-of-way area shown on the plans extends into the Mississippi River.

9. James Vogt and Bernard Vogt are fee simple owners of real property located in Monroe County, Illinois, adjacent, both north and south, to the right-of-way dedicated to the State of Illinois for this project, although the exact description of the land belonging to Bernard Vogt, to James Vogt and to both as co-owners is in dispute.

10. On or about August 18, 1977, and on August 25, 1977, Norbert Vogt, Bernard Vogt and James Vogt met at the Vogt's residence with William Pierson and Robert Newsom, both agents representing plaintiffs.

11. On August 31, 1977, Bernard and James Vogt sent a notice to Fruin–Colnon Corporation which purported to describe the property belonging to Bernard Vogt, individually, and to Bernard Vogt and James Vogt, as co-owners. This notice further advised Fruin–Colnon Corporation that any trespassing on or to the premises so described, whether by Fruin–Colnon Corporation, its agents, or employees, or anyone under its direction would be "vigorously pursued by all legal means."

12. On October 26, 1977, the towboat Rebel, under the direction of agents for plaintiffs, delivered a barge loaded with construction materials to a point located within the right-of-way area. In order to reach the construction site, the Rebel and its tow traveled in a southwardly direction from the Mississippi River and on a slough cutting through the Vogts' property directly connecting the Mississippi River with the construction site. After the barge was unloaded, the Rebel returned by means of the same route.

13. On many occasions, the plaintiffs had work barges and other river vessels situated on the Mississippi River, extending at least in part, outside the right-of-way area in furtherance of the bridge construction.

14. On October 26, 1977, Bernard Vogt contacted agents for plaintiffs and complained that the traveling of the towboat Rebel and its barge through the slough constituted trespassing against his land.

15. In furtherance of the construction of the bridge piers and other substructure work at the Jefferson Barracks Bridge Project, plaintiffs have used a spud barge. A spud barge contains two vertical steel beams or spuds, both aft and stern, which are dropped into the riverbed to firmly anchor or "spud down" the barge. A crane is mounted on the deck of the spud barge.

16. From March 10, 1978, through March 13, 1978, plaintiffs anchored a spud barge in the riverbed on the Illinois side outside of the channel and approximately 200 feet south of the southern boundary line of the right-of-way area. The spud barge so anchored was used by the plaintiffs in furtherance of the construction of the Jefferson Barracks Bridge Project. The spud barge was not tied to any trees or other structures on shore.

17. On March 13, 1978, Bernard Vogt made a complaint to the Sheriff's Department of Monroe County claiming that the work barge as situated was trespassing on his land. Mr. Vogt was then referred to the Illinois State Highway Patrol. Two Illinois State Highway Patrolmen then ap-

peared at the Jefferson Barracks Bridge Project, and cited Robert O'Connor, an employee for plaintiffs, with criminal trespass against land. Mr. O'Connor was then arrested.

18. On March 13, 1978, plaintiffs removed the spud barge from its anchored location solely because of Mr. O'Connor's arrest.

19. On or about July 6, 1979, plaintiffs began dredging operations within the right–of–way area on the Illinois side of the Mississippi River and to the north of the existing Jefferson Barracks Bridge.

20. In order to anchor the dredge barge, plaintiffs dropped anchors upriver at a location outside of the right–of–way area.

21. On or about July 6, 1979, defendant, Bernard Vogt, complained to Percy DeRousse, an agent for plaintiffs, that the anchoring of the dredge barge outside the right–of–way area constituted trespassing against the Vogts' property.

## LAW

The dispositive questions in this litigation are essentially questions of law. Plaintiff contends that this project is a federal project, and so the federal "navigational servitude" applies to the project; that the activities in constructing the bridge are within the scope of the navigational servitude; that defendants' riparian and riverbed ownership rights are subordinate to the navigational servitude; that plaintiff is not liable in any way for its activities because of the navigational servitude; and that defendants are prohibited from interfering with the activities because of the navigational servitude.

■■■ The existence of a federal navigational servitude on navigable waterways is certainly not in doubt. It has its roots in the commerce clause of the United States Constitution, Art. I, Sec. 8, cl. 3. *Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 724–25, 18 L.Ed. 96 (1865). Navigable waters "are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing..." *Shively v. Bowlby*, 152 U.S. 1, 11, 14 S.Ct. 548, 551, 38 L.Ed. 331 (1893). Moreover, the power of Congress to act in furtherance of navigation is not narrow.

> Whether, under local law, the title to the bed of the stream is retained by the State or the title of the riparian owner extends to the thread of the stream... the rights of the title holder are subordinate to the dominant power of the federal government in respect of navigation.

> The power of Congress extends not only to keeping clear the channels of interstate navigation by the prohibition or removal of actual obstructions located by the riparian owner or others, but comprehends as well the power to improve and enlarge their navigability.

*United States v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co.*, 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941). It apparently includes the right to erect lighthouses and jetties in the bed of a navigable stream without compensating the owners. *South Carolina v. Georgia*, 93 U.S. 4, 23 L.Ed. 782 (1876).

■■ However, a threshold question is whether this bridge project can be considered an Act or action of Congress, or the federal government to which the navigational servitude applies. This Court considers the project to be of a joint federal–state nature, to which the navigational servitude does apply. While the federal money is channelled through the Illinois Department of Transportation, and the contracts were let and entered into by the State, *see* 23 U.S.C. § 145 (1979), uncontradicted testimony at trial indicated that the funding on the project was 90% federal. Moreover, this project was initiated under the Federal–Aid Highway Act, 23 U.S.C. § 101 *et seq.*, a comprehensive program designed so to promote "the prompt and early completion of the National System or Interstate and Defense Highways, so named because of its primary importance to the national defense and ... essential to the national

interest ..." 23 U.S.C. § 101 (1978). Considering the Act's importance and the sheer size of the federal payments mobilized in furtherance of the Act, it seems obvious that this is sufficiently federal a project for the navigational servitude to apply.

■ Since the navigational servitude does apply to this project, the next question is whether the bridge building activities are within its scope. Defendant admits that activities such as boating, swimming and fishing may be allowed on the water, but contends essentially that bridge building is not enough like navigation to be included within the navigational servitude. The Court agrees with defendant.

The purpose of the navigational servitude is to allow Congress to develop navigation on streams large enough to carry commercial traffic for the benefit of all the States. While this project may benefit the federal highway system and traffic movement between Missouri and Illinois, that is, for the benefit of commerce in general, it is hard to see how it aids navigation. In fact, the presence of additional bridge supports in the water could be expected to further complicate navigation. Plaintiff relies heavily on *United States v. 50 Foot Right of Way*, 217 F.Supp. 882 (D.N.J.1963), which broadly construed the navigational servitude to allow construction of an interstate pipeline, authorized by Congress, in navigable waters without compensation to the riparian owner of the riverbed. However, that case was reversed on appeal. *United States v. 50 Foot Right of Way*, 337 F.2d 956 (3d Cir. 1964). This Court can find no appellate court case supportive of plaintiffs' interpretation of the navigational servitude, save dicta from old cases which is not as persuasive as the explicit holding of the Third Circuit in *50 Foot Right of Way, supra*. *See, United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 62–63, 33 S.Ct. 667, 671–672, 57 L.Ed. 1063 (1913); *Scranton v. Wheeler*, 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126 (1900). *See also Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383 (1979).

■ Since the navigational servitude does not protect plaintiffs from liability, it must be determined whether defendants' riparian and riverbed ownership rights render plaintiffs liable in any way. Relevant portions of the federal statute under which the bridge project is being funded provide that:

> The authorization of the appropriation of Federal funds or their availability for expenditure under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed. The provisions of this chapter provide for a federally assisted State program.

23 U.S.C. § 145 (1979). And further,

> Notwithstanding any other provision of law, the General Bridge Act of 1946 (33 U.S.C. 525–533) shall apply to bridges authorized to be replaced, in whole or in part, by this section...

23 U.S.C. § 144 (1979). Under the General Bridge Act, the statute provides:

> There are conferred upon any individual, his heirs, legal representatives, or assigns, any firm or corporation, its successors or assigns, or any State, political subdivision, or municipality authorized in accordance with the provisions of sections 525 to 533 of this title to build a bridge between two or more States, all such rights and powers to enter upon lands and acquire, condemn, occupy, possess, and use real estate and other property in the respective States needed for the location, construction, operation, and maintenance of such bridge and its approaches, as are possessed by railroad corporations for railroad purposes or by bridge corporations for bridge purposes in the State in which such real estate or other property is situated, upon making just compensation therefor to be ascertained and paid according to the laws of such State, and the proceedings therefor shall be the same as in the condemnation or expropriation of property for public purposes in such State.

33 U.S.C. § 532 (1979). The apparent express mandate of this provision is that state

eminent domain laws should apply to the case at hand. Accordingly, the Court turns to Illinois law.

Defendants contend that under Illinois law, a riparian landowner owns the submerged land in the bed of a river, exclusive mooring and wharfing rights in the shore area of their property, and that those acting on behalf of the State must pay compensation for uses they seek to make of the lands. Plaintiffs offer little in rebuttal to defendants' contentions and the Court finds them meritorious.

 As defendants state in their brief, courts in Illinois have consistently held that riparian landowners hold title to the middle of the main channel of the Mississippi River. It is not necessary that the deed actually recite title to the bed of the stream. Instead, title rests automatically in the riparian landowner, absent a clear statement in the deed to the contrary. *Allott v. Wilmington Power Co.*, 288 Ill. 541, 550, 123 N.E. 731 (1919); *Buttenuth v. St. Louis Bridge Co.*, 123 Ill. 535, 546–47, 17 N.E. 439 (1888). Moreover, a riparian landowner holds exclusive mooring and wharfing rights incident to that ownership. *Ensminger v. People,* 47 Ill. 384, 391 (1868); *Revell v. People*, 177 Ill. 468, 52 N.E. 1052 (1899).

 Although the project in the instant case is funded almost entirely by federal money, it is clear from the language of 23 U.S.C. § 145 that the State has a major role in the selection of projects and in executing their actual construction. The contracts are made and jobs supervised by the Illinois Department of Transportation. And under Illinois law, where the State seeks to make use of riparian lands, whether submerged beds or banks and shores, that use must be paid for. *Chicago & Pacific R. R. Co. v. Stein*, 75 Ill. 41 (1874); *Ballance v. City of Peoria*, 180 Ill. 29, 54 N.E. 428 (1899).

## CONCLUSIONS OF LAW

The foregoing discussion leads to the following conclusions of law:

1. The Jefferson Barracks Bridge Project is properly classified as a joint federal–state project in which federal involvement is sufficient to warrant application of the federal navigational servitude to activities in the construction effort.

2. The navigational servitude does not encompass the activities of tugboats and barges building a bridge for an interstate highway since this is not an aid to navigation of the river.

3. The applicable federal statutes, 23 U.S.C. § 144 and 33 U.S.C. § 532, require that Illinois law be applied in determining the rights of defendants as riparian owners.

4. Illinois law vests in defendants as owners of the riparian lands title to the riverbed to the middle of the Mississippi and to mooring and wharfing rights on the shore.

5. Illinois law requires that agents of the state compensate defendants for the use of these rights.

## CONCLUSION

Consistent with the above findings, the declaratory, injunctive and monetary relief sought by plaintiffs is hereby DENIED. The relief sought by defendants in their counterclaim is also DENIED, but the Court orders that a hearing be held on the extent of their damage to date and fair compensation for their rights.

IT IS SO ORDERED.