**FRUIN COLNON CORPORATION and Granite Construction Company, d/b/a a joint venture, Plaintiffs,**

v.

**Bernard J. VOGT, et al., Defendants.**

**Civ. No. 78–4191.**

United States District Court, S. D. Illinois.

June 22, 1982.

Michael E. Wilson and James L. Hawkins, Greesfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., Allan Goodloe, Jr., Pope & Driemeyer, Belleville, Ill., for plaintiffs.

Michael V. Frierdich, Zimmer & Frierdich, Columbia, Ill., David Stutsman, Walker & Williams, Belleville, Ill., for defendants.

## ORDER

FOREMAN, Chief Judge:

This matter is before the Court pursuant to an order granting a new trial on the issue of whether plaintiffs' construction activities fall within the scope of the federal navigational servitude and is thus beyond the reach of the state trespass laws. In the order issued on October 22, 1980, by this Court, following a non-jury trial, the question presented by the case was framed in this language:

> whether activity on a navigable waterway by construction barges building a bridge paid for almost entirely by federal money yet contracted by the state, can constitute a trespass on an adjacent owner's riparian rights in the riverbed and shore.

*Fruin-Colnon Corp. v. Vogt,* 500 F.Supp. 606 (S.D.Ill.1980). The Court found in that order that (1) the federal navigational servitude did apply even though the project was under state direction; (2) the bridge building activities were not within its scope because plaintiff had not demonstrated by a preponderance of the evidence that the project would aid navigation; and (3) since the navigational servitude did not apply, plaintiffs were subject to 33 U.S.C. § 532, which made reference to state law to fix compensation for landowners upon whose land bridges are constructed under authority of 23 U.S.C. § 144; and (4) under state law, plaintiffs, as agents of the state, were obligated to pay defendants fair compensation.

On November 12, 1980, plaintiffs filed their Motion to Alter or Amend Order, or in the Alternative, Motion for New Trial. On November 21, 1980, they filed their Notice of Appeal. On December 18, 1980, this Court granted the new trial as to the navigational servitude question only. There was some question whether the district court had authority to issue such an order. The controversy was settled when the Court of Appeals ordered on February 9, 1981, that the appeal be dismissed and this Court re-enter its order of December 18, 1981. As noted at the outset, this was done on April 2, 1981, and the new trial was held. Pursuant to that new trial, the Court makes the following findings of fact, which are intended to supplement those of October 22, 1980. *See,* 500 F.Supp. at 608–10.

### Supplemental Findings of Fact

22. The existing Jefferson Barracks Bridge contains two lanes of traffic. It has three foundation piers situated within the riverbed of the Mississippi River. These piers have been designated by the Illinois Department of Transportation (IDOT) as Piers 5, 6 and 7 (Pier 5 being the pier closest to the Missouri shore).

23. The navigation channel of the Mississippi River at Jefferson Barracks is located directly off the Missouri shore, generally between Piers 5 and 6 of the existing bridge.

24. The horizontal navigational clearance between Piers 5 and 6 of the existing Jefferson Barracks Bridge is 645 feet.

25. On June 29, 1967, the Illinois Division of Highways, predecessor to the IDOT, applied to the United States Army Corps of Engineers, for a bridge permit. By this application for permit, the Division of Highways sought approval of the Chief of Engineers and the Secretary of the Army for the construction of a new two-lane bridge across the Mississippi River adjacent to the existing two-lane Jefferson Barracks Bridge. The plans proposed replacement of the existing superstructure with a new superstructure. The existing piers, however, were to remain and be utilized for the existing bridge which was to carry eastbound traffic. The new bridge constructed upstream would carry the westbound traffic. As originally designed, the navigational channel and clearance between the Jefferson Barracks Bridge piers would remain 645 feet.

26. On November 29, 1967, the United States Coast Guard approved the location and the plans for the new bridge project as proposed in the bridge permit application referenced above dated June 29, 1967.

27. The Federal Highway Administration rejected the original design because it permitted only four lanes of traffic, suggesting the project be redesigned to handle six lanes of traffic.

28. The IDOT, in conjunction with the Missouri State Highway Commission, then began studies for a redesign which could accommodate six lanes of traffic.

29. On February 27, 1973, representatives from the IDOT and the Coast Guard met to discuss revisions in the application for a bridge permit to cover two bridges which would have the capacity to handle six lanes of traffic. The IDOT explained that a redesign requiring six lane capacity meant the existing bridge would have to be removed. The Coast Guard's position under these circumstances was that an entirely new application should be made for a

bridge permit. Furthermore, the Coast Guard stated that private river transportation interests might have serious objections with a redesign which left the existing piers in place.

30. On March 16, 1973, Mr. Thoroughman, Chief of the Bridge Branch for the Second District Coast Guard, telephoned Mr. Thunman, design engineer for the IDOT. During this conversation, Mr. Thoroughman stated that navigational interests wanted substantially more horizontal clearance under the bridge if the existing structure was going to be removed. Mr. Thoroughman related that the river transportation industry did not object to the original design because it provided that the existing structure would remain in place. Mr. Thoroughman advised Mr. Thunman to give due consideration to the concerns of the navigational interests when redesigning the project.

31. On March 27, 1973, representatives of the IDOT, Coast Guard, Missouri State Highway Commission and two barge line companies met to discuss the requirements for river navigation under the Jefferson Barracks during the meeting. Based on discussions with representatives of the water transportation industry, the Coast Guard stated that in the interests of safety to navigation and to the bridge structure, greater horizontal navigational clearance seemed warranted. The IDOT agreed to study a design allowing 850 feet of horizontal navigational clearance similar to the I–57 bridge constructed by the IDOT on the Mississippi River at Cairo, Illinois. The Missouri State Highway Commission agreed to study a design allowing 900 feet of horizontal clearance similar to the bridge the Commission constructed on the Mississippi River at Caruthersville, Missouri.

32. On April 5, 1973, the Missouri State Highway Commission recommended to the IDOT that the redesign not utilize the existing piers, but instead "construct two new structures with span lengths that would be acceptable to the Coast Guard which [the Commission believed should be] probably in the neighborhood of 800 feet to 850 feet . . ."

33. On August 2, 1973, a meeting was held at the Coast Guard office in St. Louis attended by, among others, Captain Beaver of the Valley Line Barge Company, Mr. Thoroughman of the Coast Guard and Mr. Thunman and Mr. Kowert of the IDOT. At that meeting, Mr. Kowert indicated that the IDOT would like to resolve the optimum location of the bridge piers to provide the proposed "850 feet sailing span." Captain Beaver stated that barge traffic runs the bridge by radar. Mr. Thoroughman noted that if the westernmost pier was located in the river rather than on shore, there would be some concern with respect to river traffic which ran on radar. Mr. Thoroughman further stated that an 850 foot span would meet the reasonable needs of navigation and that the piers to be located on the Missouri side should be set back to the west from the existing pier (Pier 5).

34. On January 30, 1976, the IDOT submitted to the Coast Guard its new application for bridge permit to construct the project as redesigned. The IDOT estimated that the dual structure would cost approximately $33,500,000, of which roughly $2,800,000 was attributable to providing increased clearances for navigation.

35. On May 9, 1977, the Coast Guard acted upon the application submitted by issuing a bridge permit for the current project.

36. The Jefferson Barracks Bridge under construction pursuant to such permit will be a dual structure resting on foundation piers as well as the bridge abutments. The piers for each structure are denominated by the IDOT, going from east to west, as Piers 1 through 14, although Piers 12 and 13 are each a single structure providing support for both bridge superstructures, as opposed to the other piers which provide support for one superstructure only.

37. The horizontal navigational clearance to be provided by the Jefferson Barracks Bridge under construction will be 850 feet. This represents an increase of 205 feet in the horizontal navigational clearance between the principal river piers which

stand on the east and west edges of the navigational channel at the Jefferson Barracks Bridge site. The vertical clearance between low steel on the new bridge and the two percent line (that elevation which is exceeded only 2% of the time) is 61.2 feet.

38. The navigation channel of the Mississippi River is located between Piers 12 and 13 of the new bridge.

39. The great mass or bulk of river traffic using the Mississippi River at Jefferson Barracks travels within the navigation channel of the River.

40. The vertical clearance between low steel and the two percent line at the I–57 bridge spanning the Mississippi River at Cairo is approximately 60 feet. The tallest vessels which navigate the Mississippi River between St. Louis and Cairo are approximately 55 feet tall.

41. The Jefferson Barracks Bridge Project is an aid and improvement to navigation on the Mississippi River because the horizontal navigational clearance under the bridge where the navigation channel is located will be expanded from 645 feet to 850 feet, thereby improving safe passage under the bridge, and because Pier 13 is located closer to the Missouri shore than Pier 5 of the existing bridge, thereby improving safe passage under the bridge when radar is used.

42. On December 18, 1963, April 24, 1972 and November 16, 1978, the States of Illinois and Missouri entered into a series of agreements wherein the States agreed, among other things, to each pay 50% of the project costs in excess of those paid by the Federal Highway Administration.

43. On or about August 29, 1977, the Federal Highway Administration and the IDOT entered into a Federal Aid Project Agreement whereby the Federal Highway Administration agreed to pay 90% of the project costs.

44. The Jefferson Barracks Bridge project is funded 90% by the federal government, 5% by the State of Illinois and 5% by the State of Missouri.

45. The Federal Highway Administration expressly approved the letting of the contract by the I.D.O.T. to plaintiffs.

46. The 300 foot bridge right-of-way was secured by the State of Illinois for the purpose of placing the physical structures of the project, such as the bridge abutments, piers and cofferdams, within the right-of-way.

47. It is not feasible for plaintiffs to keep their spud barges, dredge barges and other work vessels within the right-of-way because the right-of-way, within which the existing bridge is now located, provides too little room to do the work in a safe manner.

48. The ordinary high water mark at the Jefferson Barracks Bridge is 401.1 feet mean sea level.

49. At all relevant times, the level of the Mississippi River has been below 401.1 feet mean sea level and therefore all of plaintiffs' water-related activities have occurred within the Mississippi River below the ordinary high water mark.

## LAW

The above findings of fact reflect the Court's finding that the improvements do in fact aid navigation on the river. Thus, according to the law as interpreted by this Court in the order of October 22, 1980, the navigational servitude should apply and a judgment in plaintiffs' favor should be made. However, the Court is met at the outset by defendants' arguments as set forth in their "Objection" of April 2, 1981. They argue that: (1) the navigational servitude does not apply since plaintiffs have not met their twofold burden of demonstrating that they are agents of the federal government and that the project has the purpose of improving navigation; (2) neither plaintiffs nor the State of Illinois are agents of the federal government for the project and thus they cannot take advantage of the navigational servitude; and (3) aside from the applicability of the navigational servitude, the Federal Aid Highway Act contemplates and requires application of state eminent domain laws and procedures and Congress has thereby expressly declined to in-

voke its navigational servitude with respect to this project.

Upon reconsideration of the entire matter, the Court has reached the conclusion that defendants are correct in asserting that Congress has expressly declined to invoke its federal navigational servitude with respect to this project and that plaintiffs may not take advantage of its protections.

The relevant portions of the Federal Aid Highway Act provide:

The authorization of the appropriation of Federal funds or their availability for expenditure under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed. The provisions of this chapter provide for a federally assisted State program.

23 U.S.C. § 145 (1979). And further,

Notwithstanding any other provision of law, the General Bridge Act of 1946 (33 U.S.C. 525–533) shall apply to bridges authorized to be replaced, in whole or in part, by this section . . .

23 U.S.C. § 144 (1979). Under the General Bridge Act,

There are conferred upon any individual, his heirs, legal representatives, or assigns, any firm or corporation, its successors or assigns, or any State, political subdivision, or municipality authorized in accordance with the provisions of sections 525 to 533 of this title to build a bridge between two or more States, all such rights and powers to enter upon lands and acquire, condemn, occupy, possess, and use real estate and other property in the respective States needed for the location, construction, operation, and maintenance of such bridge and its approaches, as are possessed by railroad corporations for railroad purposes or by bridge corporations for bridge purposes in the State in which such real estate or other property is situated, upon making just compensation therefor to be ascertained and paid according to the laws of such State, and the proceedings therefor shall be the same as in the condemnation or expropriation of property for public purposes in such State.

33 U.S.C. § 532 (1979). Section 532 gives the State or those acting at its direction the power to enter upon and acquire land for purposes of bridge construction, but expressly provides that "just compensation" be made according to the laws of the State. Thus, by the plain language of the statute, Congress has elected to recognize and compensate state property rights in accordance with the laws of the State, as if the property had been condemned "for public purposes in such State."

The Court agrees with defendants that this result is bolstered by the decision of the United States Supreme Court in *United States v. Gerlach Livestock Co.*, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950). In *Gerlach*, the respondents were owners of grasslands which depended for water upon seasonal inundations from river overflows. The United States impaired the value of these lands with the construction of the Friant Dam, which harnessed and equalized the seasonal flows of river waters. The Government, when sued in the Court of Claims for the value of lost annual water flows, contended that the damage was noncompensable since the project was authorized by Congress under the commerce power for control of navigation. The high court held that in undertaking the project, Congress did not intend to invoke the navigational servitude, but, on the contrary, "proceeded on the basis of full recognition of water rights having valid existence under state law. By its command that the provisions of the reclamation law should govern the construction, operation and maintenance of the several construction projects, Congress directed the Secretary of the Interior to proceed in conformity with state laws, giving full recognition to every right vested under those laws." 339 U.S. at 734, 70 S.Ct. at 960. The statute in *Gerlach* provided that "nothing in this Act shall be construed as affecting . . . in any way . . . the laws of the State . . . relating to the control, appropriation, use or distribution of water used in irrigation . . ." 43 U.S.C. § 379. Similarly, the language of 33 U.S.C.

§ 532, *supra*, provides that just compensation shall be "ascertained and paid according to the laws of such state." Thus, as in *Gerlach,* the language of the statute evidences Congress' intent to forego the power it has under the Commerce Clause and pay landowners for their property according to the laws of the state in which they reside. *See also, Henry Ford & Son v. Little Falls Fibre Co.,* 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483 (1930).

Plaintiffs' attempt to distinguish *Gerlach* is without merit. Plaintiffs argue that (1) there is no clear expression of Congressional intent not to exercise the navigational servitude and (2) Illinois law considers the damages suffered by a riparian owner when improvements are built in navigable waters to be *damnum absque injuria.* The first objection is belied by the statutory language itself. With respect to the second, it is true that section 532 does not, in so many words, state that "riparian rights in Illinois shall not be compensated during activities undertaken by virtue of this Act." However, the question is whether Congress intended to invoke its Commerce Clause power on a nationwide basis by virtue of the General Bridge Act. The state of the law in Illinois sheds little if no light on this question of federal statutory interpretation.

This Court's decision that Congress has decided in section 532 not to invoke the navigational servitude but instead award landowners compensation in accordance with state law eliminates the need for reconsideration of certain other issues, such as whether plaintiffs are or need to be agents of Congress to take advantage of the navigational servitude. However, the question remains for reconsideration whether there has been a compensable taking or injury under the laws of Illinois.

This Court stated in its prior order that courts in Illinois have consistently held that riparian landowners hold title to the middle of the main channel of the Mississippi River. It is not necessary that the deed actually recite title to the bed of the stream. Instead, title rests automatically in the riparian landowner, absent a clear statement in the deed to the contrary. *Allott v. Wilmington Power Co.,* 288 Ill. 531, 550, 123 N.E. 731 (1919); *Buttenuth v. St. Louis Bridge Co.,* 123 Ill. 535, 547–47, 17 N.E. 439 (1888). Moreover, a riparian landowner holds exclusive mooring and wharfing rights incident to that ownership. *Ensminger v. People,* 47 Ill. 384, 391 (1868); *Revell v. People,* 177 Ill. 468, 52 N.E. 1052 (1899).

Although the project in the instant case is funded almost entirely by federal money, it is clear from the language of 23 U.S.C. § 145 that the State has a major role in the selection of projects and in executing their actual construction. The contracts are made and jobs supervised by the Illinois Department of Transportation. And under Illinois law, where the State seeks to make use of riparian lands, whether submerged beds or banks and shores, that use must be paid for. *Chicago & Pacific R.R. Co. v. Stein,* 75 Ill. 41 (1874); *Ballance v. City of Peoria,* 180 Ill. 29, 54 N.E. 428 (1899).

500 F.Supp. at 612. Plaintiffs argue that the navigational servitude is not limited to Congress under the Commerce Power, but extends to the State of Illinois under the "superior navigational easement." Under this concept, "the State of Illinois, or any one of its state or municipal arms, has the power to use navigable waters for improvements which aid navigation, and that under such circumstances, the riparian owner's damages are *damnum absque injuria* ..." Plaintiffs' Memorandum of Law at 14, filed April 2, 1981, citing, *inter alia, Beidler v. Sanitary District,* 211 Ill. 628, 71 N.E. 1118 (1904).

The cases cited by plaintiffs do seem to stand for the common law proposition that riparian rights are subject to a servitude for the public "[w]ith respect to navigable streams, the right of the riparian owner is subject to a public easement to use the river for navigational purposes." *Leitch v. Sanitary Dist. of Chicago,* 369 Ill. 469, 17 N.E.2d 34 (1938). In *Leitch,* the Illinois Supreme Court cited with approval an earlier case from the same court, which stated that "it

is true that the rights of the plaintiffs are subject to the public right of navigation, and that damages resulting in consequence of any work by the public *for the purpose of improving navigation* are damages for which no recovery can be had . . ." *Beidler v. Sanitary Dist. of Chicago*, 211 Ill. 628, 637, 71 N.E. 1118 (1904). In *Beidler*, plaintiffs sued the Sanitary District for damages incurred to their docking facilities when a district sewage project lowered the water level in the south branch of the Chicago River. The plaintiffs excavated and deepened at a cost of $10,000 the canals to the extent the water had subsided and repaired their dock facilities at a cost of $15,000 to accommodate the lower level, and sought recovery for these amounts. The Supreme Court acknowledged the above quoted principle that damage to riparian rights need not be recompensed when the state acts in furtherance of navigation. However, since this project was to improve sewage control, and not to aid navigation on the south branch, the Supreme Court held that plaintiffs had an action for damages.

> Here, the waters were taken and their general levels reduced for the purpose of making navigable an artificial channel and not for the purpose of facilitating the navigation of the south branch of the Chicago River or any stream or body of water naturally emptying into it or any stream or lake into which it naturally empties.
>
> [F]rom an examination of the act for the creation of sanitary districts, [it is evident] that the primary and principal purpose of their creation under the statute is to provide for the presentation of the public health by improving the facilities for the final disposition of sewage and by supplying pure water. The fact that a navigable waterway may be created is a mere incident, and not one of the purposes for which a sanitary district is created.

211 Ill. at 637–38, 71 N.E. 1118. Defendants in their "Memorandum of Law" of April 2, 1981, apparently acknowledge the applicability of *Beidler*, but argue that *Beidler* stands for the proposition that a project must have as its "primary purpose" the improvement of navigation, and that an incidental improvement will not suffice. Defendants point to the testimony of IDOT design engineer, Thunman, that the only reason for rejection of the original bridge design was an insufficient number of auto traffic lanes and the only reason for construction of the bridge is to accommodate highway traffic. Thus, since the improvement to navigation occasioned by the project is incidental, Illinois law mandates that the superior navigational easement in favor of the public does not apply.

This Court does not read *Beidler* so narrowly. The Illinois Supreme Court did not announce a categorical "primary and principal purpose" test alone, but also addressed the question in terms of "the purposes for which a sanitary district is created," thus contemplating consideration of more than one single, solitary purpose. Moreover, the facts of *Beidler* do not suggest a search for the "primary purpose" of a project since in that case, the activities of the Sanitary District did not take place on the navigable stream in question, the south branch of the Chicago River, at all, but on another, unconnected stream. Those activities on that other stream could not have been related in any way to furtherance of navigation on the south branch.

■ In the Court's opinion, *Beidler* stands for the proposition that a project undertaken by the state on a stream is protected by the superior navigational easement if one of the purposes of the project in fact aids navigation. This result is suggested by the analysis above. It is also suggested by logic. First, requiring a finding of "principal purpose" would not be consistent with the rationale of the superior navigational easement. If it significantly aids navigation on the river a project deserves the protection. A very large project which provided a significant benefit to navigation but the primary purpose of which was not to aid navigation would presumably fall without the easement, while a much smaller, "primary purpose" project would fall within it. Logic does not support the dis-

tinction, since the larger project provides the greater benefit. Second, the inquiry into the "primary purpose" of a project would be an impossible one. A governmental project on a navigable stream can have many purposes, and those purposes can be the composite of many diverse wills and judgments. It would be well nigh impossible to pin a "primary purpose" on many projects, and the difficulty could result in denying the people of the State the benefits of the easement when in fact navigation was furthered by a project.

■ Turning to the facts of the case at bar, it is clear that this project meets the requirements for application of the superior navigational easement. First, the project has as one of its purposes the furtherance of navigation. Testimony indicated that the Coast Guard, which according to regulations had to approve the project, objected to a redesign of the bridge which would leave the existing bridge piers in place and spoke with concern for private river transportation interests. Mr. Thoroughman, Chief of the Bridge Branch for the Second District Coast Guard, advised engineer Thunman to give due consideration to private navigation interests. Finding of Fact No. 30. Furthermore, in a meeting of the IDOT, Coast Guard, Missouri State Highway Commission and two barge line companies, both highway commissions agreed to study a Coast Guard proposal allowing greater navigational clearance under the new bridge. Findings of Fact No. 31–32. The design finally submitted to the Coast Guard by IDOT had an estimated cost of $33,500,000, of which $2,800,000 was attributable to increased navigational clearance. The bridge permit issued on May 9, 1977, from the Coast Guard, the very body which urged increased navigational clearance. Findings of Fact No. 34–35. Thus, it is clear that the project developed and was approved at least in part on the basis that it improved navigation, and that was in fact one of its purposes.

Second, there is no doubt on the record that the project in fact improves navigation. There will be an increase of 205 feet in the horizontal navigational clearance between the two principal river piers. Findings of Fact Nos. 37–41.

Pursuant to the above discussion, the Court makes the following conclusions of law.

1. The federal navigational servitude does not apply to plaintiffs' construction activities on the Mississippi River since Congress elected by virtue of 33 U.S.C. § 532 not to exercise its navigational servitude but to pay compensation for riparian and property rights in accordance with state law.

2. The applicable federal statutes, 23 U.S.C. § 144 and 33 U.S.C. § 532, require that Illinois law be applied in determining the rights of defendants as riparian owners.

3. Illinois law vests in defendants as owners of the riparian lands title to the riverbed to the middle of the Mississippi and to mooring and wharfing rights on the shore.

■ 4. However, under Illinois law, a riparian owner's fee in the riverbed of navigable waters is subject to the superior navigational easement to use the waters and bed below for purposes of navigation.

5. This navigational easement permits the state government to construct improvements which aid navigation on the navigable waters within which the improvements are located.

■ 6. In constructing an improvement in navigable waters below the ordinary high water mark, where said structure, among other things, aids and improves navigation, the state government is exercising the navigational easement and is not "taking" the private property of the riparian owner.

■ 7. Plaintiffs' temporary use of the riverbed of the Mississippi River for spudding down crane barges and anchoring river vessels used in the construction of the Jefferson Barracks Bridge project is a lawful exercise of the public's navigation easement in the Mississippi River, and, consequently, plaintiffs are not thereby trespassing on defendants' property.

Consistent with the above findings of fact and conclusions of law, the declaratory relief sought by plaintiffs is herewith GRANTED, and the relief sought by defendants in the counterclaim is DENIED. Since the Court bifurcated the trial, there remains for decision the prayer of plaintiffs for damages. It has come to the attention of the Court that plaintiffs have completed work on the project. Since the primary aspect of plaintiffs' suit was declaratory relief, plaintiff may not be interested in pursuing damage relief. Therefore, plaintiffs are hereby ORDERED to file within ten (10) days an affidavit specifying their elements of damage, or notice that they do not intend to pursue the damage claim. At that time, the Court shall consider the need for a hearing, if any, and entry of final judgment.

IT IS SO ORDERED.